IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| ESTATE OF RANKIN M. SMITH, SR., SUNTRUST BANK, TAYLOR W. SMITH, and RANKIN M. SMITH, JR., Co-Executors, | ) | Case No. 05-1028 T |
| Plaintiff, | ) | Judge Marian Blank Horn |
| v. | ) | |
| UNITED STATES OF AMERICA, | ) | |
| Defendant. | ) | |

**MEMORANDUM IN OPPOSITION TO**
**<u>DEFENDANT'S MOTION TO DISMISS</u>**

Judith A. Mather (Attorney of Record)
Tel: (202) 776-2714
Fax: (202) 776-4714
Email: jmather@dowlohnes.com
DOW LOHNES PLLC
1200 New Hampshire Ave., N.W., Ste. 800
Washington, D.C. 20036

Alex. L. Bertoldo (Of Counsel)
Tel: (202) 776-2045
Fax: (202) 776-4045
Email: abertoldo@dowlohnes.com
DOW LOHNES PLLC
1200 New Hampshire Ave., N.W., Ste. 800
Washington, D.C. 20036

ATTORNEYS FOR PLAINTIFF

Dated: August 2, 2006

**TABLE OF CONTENTS**


**Page**

INTRODUCTION ..... 1

STATEMENT OF THE CASE ..... 2

A. Administrative Proceedings ..... 2

B. Refund Suit ..... 6

1. The Transcript (Form 4340) ..... 7
2. Summary Record of Assessment (Form 23C) ..... 7
3. The Computations ..... 8
4. The IRS's Increasingly Arbitrary Positions ..... 10

a. The June 27th Meeting ..... 10

b. The July 10th Meeting ..... 12

ARGUMENT ..... 13

A. The Court Has Authority To Determine Its Own Jurisdiction ..... 13

B. The Transcript Improperly Fails To Take Into Account The Mandatory State Death Tax Credit ..... 14

1. The state death tax credit is mandatory ..... 14

a. For nearly 50 years the Service has acquiesced to the principal that the state death tax credit is mandatory ..... 16

b. The Service's argument that it cannot determine the maximum allowable state death tax credit, unless the Estate concedes the Service's valuation, is absurd ..... 17

2. Assuming *arguendo* that the Estate prevailed on the valuation issues in the case at bar, the Service could simply offset the decreased state death tax credit against the tax refund owed to the Estate ..... 20
3. The Service's purported "90-Day Rule" is contrary to statutory authority and Revenue Rulings ..... 20
4. The Estate claimed the state death tax credit within four years of filing its return and even within 90-days of the Notice of Deficiency, in multiple ways ..... 22

C. The Transcript Should Be Disregarded And The Court Should Make Findings Based On An Examination Of The Underlying Facts ..... 23

1. The Transcript fails to take into account deductions for payments of interest that the Transcript itself admits were received ..... 23

## TABLE OF CONTENTS
(Continued)

**Page**


2. The Transcript contains patent irregularities ........ 24

a. The dates on which assessments were entered into the master file are inconsistent with the dates on which the assessments were allegedly made, requiring an examination of the underlying Form 23C to determine if the assessment of additional tax was properly made ........ 25

b. The Transcript contains an erroneous filing date for the Estate's tax return, and, consequently, contains an erroneous assessment statute expiration date ........ 26

c. Where the validity of the assessment is in question, the Service must be required to produce the Summary Record of Assessment (Form 23C) ........ 26

d. The Transcript improperly fails to take into account the Estate's payments ........ 27

D. Based On The Evidence, The Court Should Make A Jurisdictional Finding That The Estate Has Fully Paid Its Estate Tax Liability ........ 28

E. Alternatively, The Court Has The Authority To Issue A Writ Of Mandamus In Aid Of Its Prospective Jurisdiction, Directing The IRS To Correct The Transcript With The State Death Tax Credit ........ 29

1. The All Writs Act provides the Court with authority to issue writs in aid of its prospective jurisdiction ........ 30

2. The circumstances here unquestionably support the issuance of a writ ........ 32

a. No other adequate means exist for the Estate to obtain relief ........ 32

b. The Estate's right to the state death tax credit is clear and undisputable ........ 35

c. A writ of mandamus directing the Service to credit the Transcript for state death tax paid is appropriate under the circumstances ........ 36

3. A writ of mandamus to protect this Court's jurisdiction is not contrary to the Tax Anti-Injunction Act ........ 38

CONCLUSION ........ 40

**TABLE OF AUTHORITIES**

**Page**

**Cases:**

*Beemis Bros. Bag Co. v. United States*, 289 U.S. 28 (1933) .......... 33

*Branning v. United States*, 11 Cl.Ct. 136 (1986) .......... 30

*Calhoun v. United States,* 32 Fed. Cl. 400 (1994) .......... 13

*Cheney v. United States Dist. Ct. for D.C.*, 542 U.S. 367 (2004) .......... 32

*Enochs v. Williams Packing and Navigation Co.*, 370 U.S. 1 (1962) .......... 38

*Estate of Phillips*, 36 B.T.A. 1102 (1937), *acq*. 1958-2 C.B. 3 .......... 14, 16, 35

*Estate of Weisberger*, 29 T.C. 217 (1957), *acq*. 1958-2 C.B. 3 .......... 14, 16, 17, 18, 19, 20, 35

*Estate of Young v. United States*, 62 Fed. Cl. 589 (2004) .......... 14, 24, 25, 26, 35

*Flora v. United States*, 362 U.S. 145 (1960) .......... 37

*Fulgoni v. United States*, 23 Cl.Ct. 119 (1991) .......... 24

*Gentry v. United States,* 962 F.2d 555 (6th Cir. 1992) .......... 14

*In re Bailey*, 182 F.3d 860 (Fed. Cir. 1999) .......... 31

*In re Makari*, 708 F.2d 709 (Fed. Cir. 1983) .......... 30, 31

*Margolis v. Banner*, 599 F.2d 435 (C.C.P.A. 1979) .......... 29, 30, 31

*N.R.D.C. v. Jamison*, 815 F. Supp. 454 (D. D.C. 1992) .......... 31

*Pueblo Laguna v. United States*, 60 Fed. Cl. 133 (2004) .......... 30

*Rauenhorst v. Comm'r*, 119 T.C. 157 (2002) .......... 16

*Reynolds v. Army and Air Force Exchange Service,* 846 F.2d 746 (Fed. Cir. 1988) .......... 13

*Roche v. Evaporated Milk Ass'n*, 319 U.S. 21 .......... 31

*Rocovich v. United States*, 933 F.2d 991 (Fed. Cir. 1991) .......... 1

*Ruth v. United States*, 823 F.2d 1091 (7th Cir. 1987) .......... 35

*Shore v. United States*, 9 F.3d 1524(Fed. Cir. 1993) .......... 13, 27

*Telecommunications Research and Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984) .......... 32

*Thomas v. United States*, 56 Fed. Cl. 112 (2003) .......... 13

**Statutes:**

26 U.S.C. § 6166 (referred to as IRC) .......... *passim*

IRC § 2011 .......... 12, 16, 17

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

IRC § 2011(a) ........ 14, 15, 17, 18
IRC § 2011(b) ........ 15, 18
IRC § 2011(b) (2)........ 18
IRC § 2011(c) ........ 21, 34, 35
IRC § 2011(f)........ 18
IRC § 2016........ 14, 16, 17, 20
I.R.C. § 6203........ 26, 27
IRC § 6213(a) ........ 20, 21, 26, 34
IRC § 6401(a) ........ 28
IRC § 6402........ 20
IRC § 6404(a) ........ 21
IRC § 6501(a) ........ 21, 26, 34
IRC § 6501(c) ........ 21
IRC § 6503(a) ........ 21
IRC § 6511........ 19
IRC § 6532(a) ........ 19
IRC § 7421........ 37. 38
IRC § 7421(a) ........ 37, 38
IRC § 7422........ 29, 36
IRC § 810........ 19
IRC § 812(e)(1)(F) (1939 Code)........ 19
IRC § 813(b) (1939 Code) ........ 19
Rev. Proc. 81-27, 1981-2 CB 547........ 23, 24
Rev. Proc. 84-58, 1984-2 CB 501........ 28
28 U.S.C. § 1491........ 29, 36
28 U.S.C. § 1651(a) ........ 29, 30
Treas. Reg. § 301.6203-1........ 26, 27
GA. Code § 48-12-2 (LexisNexis)........ 15

**TABLE OF AUTHORITIES**
**(Continued)**

**Page**

**Miscellaneous:**

Chief Counsel Advice 200108040 (issued February 23, 2001) ........ 14, 16, 35

Field Service Advisory 200051044 (issued on December 22, 2000) ........ 14, 16, 35

Job Creation and Worker Assistance Act of 2002, P.L. 107-147 § 411(h) ........ 16

Job Creation and Worker Assistance Act of 2002, P.L. 107-147 § 532(a) ........ 16

Revenue Ruling 55-380, 1955-1 C.B. 462 ........ 21, 22, 23, 37

IRS SCA 199941039 ........ 33

Jeffrey A. Cooper, *Interstate Competition and State Death Taxes: A Modern Crisis in Historical Perspective*, 33 Pepp. L. Rev. 835 (2006) ........ 15

## INTRODUCTION

The government's motion to dismiss must be denied where it not only fails to introduce sufficient evidence to support its assertion that the Estate has an outstanding balance of tax due, relying only on a Certificate of Assessments and Payments (the "Transcript") fraught with irregularities, but also takes positions that are contrary to law, contrary to its own precedent and wholly arbitrary. Indeed, several of the irregularities in the Transcript cast doubt on whether the Internal Revenue Service (the "Service" or sometimes the "IRS") even assessed the $13,644,400 in additional tax on June 20, 2002 as it alleges.[1] The government has had nine months to examine the Transcript and either explain its irregularities or correct them. Instead, it has chosen to do neither, submitting the same facially irregular Transcript to the Court as the basis for its motion to dismiss. On the other hand, the plaintiff (sometimes, the "Estate") has provided the government with evidence that its tax liability has been paid in full, including computations prepared by Laura H. Peebles, CPA/PFS, the author of the BNA Portfolio #844-2nd, *Estate Tax Credits and Computations,* and is providing this evidence to the Court along with this opposition. *See* Pl. Ex. A (Declaration of Laura H. Peebles, with attached computations).

Faced with a patently erroneous Transcript, the Court has two remedies available. First, the Court may examine the underlying facts and make the jurisdictional finding that the Estate fully paid its tax liability prior to bringing this refund suit. These findings would take into

---

[1] Despite an internal IRS request on June 9, 2006, for expedited production of the Summary Record of Assessment (the legally dispositive document by which an assessment is made, also known as a Form 23C), the government has been unable to locate this document. After examining the evidence, the Court may make a jurisdictional finding that the alleged assessment of $13,644,400 was never made where the Service has been unable to produce the Form 23C and its inept handling of the records rules out any presumption of administrative regularity. *See Rocovich v. United States*, 933 F.2d 991, 994 (Fed. Cir. 1991) (An inquiry into the jurisdictional question of whether an assessment was made was proper without prior payment of the assessment where taxpayer alleged that assessment had never been made.)

account (a) the mandatory dollar-for-dollar credit for the $2,867,246 in additional state death taxes that the Estate paid to the State of Georgia solely as a result of the Service's own increase to the value of the Estate in its Statutory Notice of Deficiency and (b) the deduction of interest payments which the Service admittedly received pursuant to the Estate's election under 26 U.S.C. § 6166 (hereinafter, 26 U.S.C. § 1, *et seq.*, the Internal Revenue Code of 1986, as amended, shall be referred to as the "IRC").[2]

In the alternative, under the distinct circumstances of this case, the Court may issue a Writ of Mandamus under the All Writs Act in aid of its prospective jurisdiction, directing the Service to correct the Transcript to reflect the mandatory state death tax credit. By the government's own computations, this would result in a balance of only $533,455.81, even without the deduction for interest payments made by the Estate pursuant to IRC § 6166. *See* Pl. Ex. B, p. B3, part 2 (DOJ computation of tax due with state death tax credit); Pl. Ex. C. (DOJ Proof for Pl. Ex. B). As reflected in the government's computations, further crediting the IRC § 6166 interest payments would result in a $0 balance. *See* Pl. Ex. G, p. G3, part 2.

STATEMENT OF THE CASE

A. ADMINISTRATIVE PROCEEDINGS

The Co-Executors filed the Estate's Form 706, United States Estate (and Generation Skipping Transfer) Tax Return (the "Original Return"), with the Internal Revenue Service Center, Atlanta, Georgia, on January 26, 1999. *See* Govt. Motion, p. 2. The Estate reported a gross taxable estate of $23,516,235, and a tax liability of $9,750,765. A copy of the Original Return is attached as Exhibit A to the Complaint.

---

[2] Citations to the Internal Revenue Code are to the Code as in effect on October 26, 1997, the date of the death of Rankin M. Smith, Sr., unless otherwise noted.

The Estate elected under IRC § 6166 to pay its estate tax obligation in ten annual installments. As required, the Estate paid $703,597 in tax when it filed the Original Return on July 26, 1998. Between July 26, 1998 and July 26, 2001, the Estate also made Section 6166 interest payments to the IRS totaling $1,979,042. *See* Def. Ex. 1 (Transcript).

On July 28, 1998, the Estate paid Georgia $4,370,059 in state death taxes based on the value of the estate reported on Form 706, and Georgia issued an Estate Tax Certificate of Payment certifying this payment and sent a copy to the IRS. *See* Pl. Ex. D, pp. D2, D5 (Declaration of Larry Childers, Tax Conferee, Georgia Dept. of Revenue). Georgia issued a refund of $1,331,921 on February 28, 1999, leaving $3,038,138 paid. *Id.* The IRS had previously been advised of this refund by the Georgia Department of Revenue on February 12, 1999. *Id.* This supported the Georgia portion of the $3,096,940 in state death taxes credited on the Notice of Deficiency.

On January 25, 2002, the Estate filed a claim for a refund with the IRS for $5,478,849.74, plus interest (the "First Refund Claim"), claiming a $12,730,733.23 reduction in the taxable estate based on a $5,369,999.95 reduction in the previously reported fair market value of the Estate's principal asset, the decedent's shares in The Five Smiths, Inc. (the "Company"), which owned the Atlanta Falcons NFL football team. The claim for refund was also based on an additional $7,360,733 deduction for administration expenses. A copy of the First Refund Claim is attached as Exhibit C to the Complaint.

On that same date, the IRS issued a Notice of Deficiency asserting a deficiency in tax of $13,644,400, plus interest from the due date of the Original Return. *See* Pl. Ex. E (Notice of Deficiency). As grounds for the deficiency, the IRS determined that the fair market value of the Estate's shares in the Company was $48,685,020, rather than $25,370,000 as reported on the

Original Return, resulting in a $23,315,000 increase in the taxable estate. The IRS also determined that, as of the date of death, decedent's personal liability as a general partner of Falcons Nest was $2,578,312, rather than $4,071,312 as reported on the Original Return, thereby increasing the taxable estate by $1,493,000. As a result, the IRS more than doubled the value of the estate, increasing the estate from $23,516,235 reported on the Original Return to $48,324,235 in the Notice of Deficiency, and increasing the tax from $9,750,765 to $23,395,165.

The Notice of Deficiency credited the Estate with the prior $3,096,940 payment of state death taxes to Georgia and Florida, and recognized a corresponding $3,969,280 increase to the maximum state death tax credit allowable, providing that the "[a]dditional credit will be allowed when payment is documented."

In February 2002, the Company sold the Atlanta Falcons, as a result of which the Estate no longer was eligible to defer its estate tax obligation. Accordingly, the Estate enlisted Deloitte & Touche (now Deloitte Tax LLP) to determine the amount that would fully pay its federal estate tax obligation, including the additional tax resulting from the IRS's increase to the taxable estate. Deloitte determined that a payment of $19,290,867 was necessary, taking into account the credit for additional state death taxes paid as a result of the increase in the Estate from $23,516,235 to $48,324,235, as well as the deduction for interest payments made pursuant to the Estate's IRC § 6166 election and for interest paid to Georgia. *See* Pl. Ex. A, p. A1, ¶2.

On March 1, 2002, the Estate hand delivered payment of $19,290,867 to the IRS, along with a letter communicating its claim for the credit of the additional state death taxes that resulted from the Notice of Deficiency. *See* Pl. Ex. F, pp. F1, F3 (Letter from SunTrust Bank to IRS). On March 4, 2002, the Estate paid $3,055,225 in additional state death taxes plus

$1,337,162 in interest to Georgia solely due to the IRS's increase in the value of the estate. *See* Pl. Ex. D, p. D4 (Letter from Larry Childers, Georgia Department of Revenue).

On March 29, Georgia issued an Estate Tax Certificate of Payment certifying the payment of this additional amount, setting forth the total state death tax credit through that date, and it sent an original to the IRS, well within 90 days of the issuance of the Notice of Deficiency. *See* Pl. Ex. D, pp. D2, D8. By letter dated April 23, 2002, Georgia refunded $129,177.00 of the tax previously paid by the Estate. The letter also stated:

> This office previously certified to the Internal Revenue Service that the State of Georgia was in receipt of State Death Taxes in the amount of $6,093,363.00. This refund reduces that amount. Therefore, we are advising the Internal Revenue Service, by means of a copy of this letter, that the Total Credit to Date is now $5,964,186.00. (emphasis added)

*See* Pl. Ex. D, p. D9. The Estate thus substantiated payment of an additional $2,867,246 in state death taxes to Georgia ($5,964,186 total payment less $3,096,940 initially allowed for taxes paid to Georgia and Florida), but the IRS failed to credit this payment against any federal estate taxes owed by the Estate.

On September 13, 2002, the Estate filed a second claim for refund (the "Second Refund Claim"), a copy of which is attached as Exhibit E to the Complaint. At that time, the IRS had not acted on the Estate's First Refund Claim, and the Estate incorporated that claim into its Second Refund Claim. In the Second Refund Claim, the Estate claimed that it was entitled to a refund in the amount of $15,722,549, consisting of $12,591,295 in overpaid tax and $3,131,254 of deficiency interest. This claim was based in large part on the Estate's challenge to the IRS's more than doubling the value of the Estate's stock in the Company. In the event the claims for refund were denied, the Estate incorporated a claim for a credit of the additional state death taxes paid as a result of the IRS's increased valuation.

By letter dated March 23, 2005, the IRS Appeals Office issued a Notice of Claim Disallowance in which the First and Second Refund Claims were "jointly and separately" disallowed. A copy of the March 23, 2005 Notice of Claim Disallowance is attached to the Complaint as Exhibit F. As set forth in the Notice, the claims were disallowed on the ground that the "examiner's adjustments to the estate tax return, as filed, are supported by the facts and applicable law . . . as explained in his report of examination." The examiner made two adjustments, increasing the value of the Estate's stock in the Company and decreasing the Estate's liability as a general partner in Falcons Nest I, Ltd. The IRS thus maintained its higher value for the gross estate, *ipso facto* mandating the higher state death tax credit.

## B. REFUND SUIT

The Estate filed the complaint in this refund action on September 23, 2005. The statute of limitations on the Estate's ability to bring a refund action will expire on March 23, 2007.

After the complaint was filed, in October 2005, government counsel obtained a copy of the Transcript, generated on October 12, 2005, and doubtless became aware that it showed a balance of $4,276,648.61. Between November 2005 and March 2006, defendant requested and received three extensions of time totaling 97 days to file its response to the complaint. In requesting those extensions, government counsel never once informed the Estate of the Transcript.

On March 3, 2006, approximately five and half months after the complaint was filed, defendant filed its answer. Defendant's answer nowhere mentioned the Transcript or raised any question as to the Court's jurisdiction. It was only at a status conference held with the Court on March 16, 2006 that defendant's counsel for the first time informed the Court and the Estate's counsel of a potential jurisdictional issue based on an alleged balance of $4,276,648.61.

1. <u>The Transcript (Form 4340)</u>

Upon being provided with a copy of the Transcript, the Estate's counsel immediately investigated the matter and determined that representatives of the Estate had been told by IRS personnel that all taxes necessary to bring the refund suit had been paid. The Estate also determined that the transcript was in error in several respects and inaccurately recorded critical facts, including the following:

a. Contrary to the Transcript, the Estate Tax Return was filed on January 26, 1999 and not on February 1, 1999. *See* Def. Ex. 1 (entry dated February 1, 1999); Govt. Motion, p.2.

b. The Transcript, in an entry dated May 19, 2003, incorrectly shows July 1, 2002 as the assessment expiration date. *See* Def. Ex. 1 (entry dated May 19, 2003). The statutory assessment period expired on June 25, 2002.

c. The assessment of additional tax of $13,644,400, dated as of June 20, 2002, does not appear on the Transcript until after a July 22, 2002 assessment, indicating that the purported June 20th assessment was entered into the IRS computer master file no earlier than July 22nd. *See* Def. Ex. 1.

d. On July 1, 2002 a refund check for $9,543,372.21 was issued to the Estate, indicating that the purported June 20th assessment had not been entered into the IRS computer master file as of that date. *See* Def. Ex. 1 (entry dated July 1, 2002); Pl. Ex. F, p. F1, ¶ 2 (Declaration of David M. Langford).

e. And, the Transcript did not reflect adjustments to the assessment that should have been made for (a) additional credit for state death taxes previously paid and substantiated, or (b) deductions of interest payments previously made by the Estate as a result of its election under IRC § 6166. *See* Def. Ex. 1.

2. <u>Summary Record of Assessment (Form 23C)</u>

Because of the irregularities in the Transcript, the Estate's counsel requested the Summary Record of Assessment (Form 23C) for the assessment of additional tax allegedly made on June 20, 2002, to determine whether the assessment was made within the statutory period for assessment ending on June 25, 2002. The date of assessment is the date on which an authorized IRS assessment officer signs the Form 23C.

The IRS advised defendant's counsel that an estate tax computations specialist at the Cincinnati Service Center had requested the Form 23C on an expedited basis on June 9, 2006. On July 26, defendant's counsel advised the Estate's counsel that the computations specialist was requesting the Form 23C from a second service center because it had not been located at the service center initially contacted. Counsel also advised that she would not have further information until some time during the week of August 1 because the involved IRS personnel were in training the week of July 24. As of the filing of this memorandum, the IRS has not been able to locate the Form 23C for the assessment against the Estate.

3. <u>The Computations</u>

The Estate's counsel also retained Laura H. Peebles, CPA/PFS, to review the Transcript and prepare a report on the Estate's tax liability. *See* Pl. Ex. A (Declaration of Laura H. Peebles, with attached reports). Ms. Peebles recomputed the federal estate tax for the Estate taking into account the Georgia state death tax credit shown on the official Georgia certificate that had been forwarded to the IRS in April 2002, the deduction for the payments of IRC § 6166 interest, and the IRS audit assessment of additional tax. Ms. Peebles also prepared a reconciliation of the entries on the Transcript with her estate tax calculation. These computations showed that the Estate's tax liability had been fully paid. *Id.*

On April 20, 2006, the Estate provided Ms. Peebles' analysis and report to the defendant. The Estate also provided copies of (i) correspondence from the Estate to the Georgia Department of Revenue, dated March 1, 2002, which forwarded the Notice of Deficiency, dated January 25, 2002, and paid an additional $4,392,387 in state death taxes and interest based on the IRS's increased value of the estate as set forth in the Notice of Deficiency, (ii) the State of Georgia Estate Tax Certificate of Payment, issued March 29, 2002, showing a total state death tax credit

of $6,093,363, and (iii) April 23, 2002 correspondence from the Georgia Department of Revenue adjusting the total credit amount to $5,964,186 as a result of a small refund from Georgia to the Estate. As set forth in the attached Declaration of Larry Childers, items (ii) and (iii) were forwarded to the IRS at the time of their issuance. *See* Pl. Ex. D, p. D2.

After receiving Ms. Peebles' report, defendant's counsel had a DOJ computation specialist examine the report and prepare computations for the purpose of better understanding the dispute over whether the Estate had fully paid its tax liability. Despite the genesis of these computations, they were produced only after the Estate filed a motion to compel. A copy of the computation schedules in attached hereto as Plaintiff's Exhibits B, C, G, and H.

The government's computations present three different alternatives for determining whether the Estate has an outstanding balance of tax. The first takes into account the IRS adjustments to the gross estate as set forth in the Notice of Deficiency and credits the Estate with only the $5,964,185.79 in state death taxes paid. Under this alternative, the outstanding tax balance is $533,455.81 and the interest balance is $5,732,558.18. *See* Pl. Ex. B, p. B3, Part 2; Pl. Ex. C. (DOJ Proof for Pl. Ex. B). Thus, when the state death tax payments are properly credited, even without consideration of the IRC § 6166 interest deductions, the amount of outstanding taxes is $533,455.81, and not the $4,276,648.61 amount demanded by the IRS.

The second alternative takes into account the IRS adjustments to the gross estate as set forth in the Notice of Deficiency, the total claimed state death tax credit of $5,964,185.79, and the full section 6166 interest deduction. Under this alternative, the outstanding tax balance is $0 and the interest balance is $1,150,197.60. *See* Pl. Ex. G, p. G3, Part 2.

The third alternative takes into account the IRS adjustments to the gross estate as set forth in the Notice of Deficiency, the total claimed state death tax credit of $5,964,185.79, and only

the section 6166 interest accrued and paid. Under this alternative, the outstanding tax balance is $0 and the interest balance is $3,497,588.48. *See* Pl. Ex. H, p. H3, Part 2.

4. The IRS's Increasingly Arbitrary Positions

At a June 8 conference with the Court, the Estate once again made its position clear that (i) the Estate had paid millions of dollars in additional state death taxes solely because the IRS had drastically increased the value of the gross estate in its Notice of Deficiency, and the IRS was required by statute to credit the amount of those state death taxes dollar-for-dollar against the IRS's tax assessment, and (ii) the Estate had paid interest under IRC § 6166, including additional interest resulting directly from the IRS's increased value for the Estate, and the deduction for these payments should have been reflected in the Transcript. The IRS, on the other hand, took the position that it would not even discuss the credit for state death taxes paid or the section 6166 interest deductions unless the Estate first dismissed its lawsuit.

The Court rejected the IRS's approach, directing the parties to meet and have a substantive discussion of the issues raised regarding the Transcript and to work through the parties' computations relative to the state death tax credit and the section 6166 interest deduction. The parties were to attempt to reach agreement on the adjusted amount that the Estate would pay to resolve the jurisdictional issue. The meeting was to include IRS personnel who could address these substantive issues.

a. The June 27th Meeting

Counsel for the parties met on June 27 for what the Estate expected would be a discussion of an amount the government would agree to accept as fully paying the Estate's tax liability so that the Estate could refile its refund suit after a brief voluntary dismissal, and the case could proceed without jurisdictional question. With that expectation in mind, Ms. Peebles

also attended the meeting, prepared to engage in a substantive discussion of the computations. The IRS was represented by Marc Sigalow, the IRS attorney who had conducted the audit of the Estate's return that nearly doubled the value of the Estate.

Mr. Sigalow agreed that the Estate was entitled to the state death tax credit of $5,964,186 as shown in Ms. Peebles' computations if the credit had been timely claimed, and in fact characterized the state death tax credit as "automatic." Similarly, Mr. Sigalow agreed that if section 6166 interest has been paid, then the estate is entitled to a deduction for the amounts paid.

Mr. Sigalow stated, however, that the Estate would have to dismiss its refund suit, pay the alleged $4,276,648.61 balance on the Transcript, and then file a new claim for refund before the IRS could consider the credit for the additional state death taxes the Estate had paid as a result of the IRS's asserted higher value for the Estate or the deduction for section 6166 interest payments previously made by the Estate. Mr. Sigalow stated that payment of the $4.2 million and filing a new claim for refund were necessary because the prior claims for refund had been disallowed and the IRS supposedly would not have authority, even after dismissal of the suit, to credit the state death taxes or section 6166 interest payments.

Mr. Sigalow did not point to any authority that would bar such credits, but took the position that the substantiation for the additional state death taxes paid by the Estate as a result of the IRS's notice of deficiency had to have been received by the IRS within 90 days of the issuance of the notice of deficiency. Following the meeting, the Estate requested the authority for Mr. Sigalow's position, which appeared to be contrary to the Code and IRS guidance. *See* Pl. Ex. I. (letter to Jennifer Spriggs from Judith Mather, dated June 28, 2006). In response to this request, Ms. Spriggs advised that Mr. Sigalow "said that the 90-day period relates to the time

allowed for filing a petition in Tax Court and related adjustments that could be made during that time period if substantiation was provided. Mr. Sigalow did not mean to imply that the 90-day period would impact the provisions set forth in I.R.C. § 2011 for claiming the state death tax credit." *See* Pl. Ex. J (Email from Jennifer Spriggs to Judith Mather, dated June 29, 2006).

The IRS's position that the Estate had to dismiss its refund action and pay $4,276,648.61 before the IRS would even consider the adjustments to the Transcript was addressed at a July 6 hearing. The Court directed counsel for the parties to attempt another meeting, with the IRS to produce a representative with authority to discuss the substantive issues.

b. The July 10th Meeting

Counsel for the parties met on July 13 with Ron Kalas, the Acting Manager of the IRS Estate and Gift Tax Section in Atlanta, Georgia. At the meeting, the Estate's counsel presented two procedural options under which, after a voluntary dismissal of the suit but without payment of the alleged balance of $4,276,648.61, the IRS could consider and adjust the Transcript to take into account the state death tax credit and section 6166 interest payments. Mr. Kalas, however, stated that a determination as to whether the IRS would consider these options would be made by the Appeals Office in St. Louis, which had last acted on the prior claims for refund, not by him.

Mr. Kalas also resurrected Mr. Sigalow's "90 day rule," taking the position that, after the passing of the 90-day period following the January 25, 2002 issuance of the notice of deficiency, the IRS could not credit the Estate for additional state death taxes paid to Georgia in March 2002 – in his words, the amount of the assessment was "set in stone." [3]

Mr. Kalas also took a dimmer view than Mr. Sigalow of the relief available through filing a new claim for refund. Mr. Sigalow had stated that the only procedure for the Estate to obtain

[3] In a status report filed by the defendant on August 1, 2006, counsel for the defendant disavowed Mr. Kalas's position as pessimistic.

the state death tax credit and section 6166 deductions was to dismiss its lawsuit, pay the balance on the Transcript, and then file a new claim for refund. But, Mr. Kalas stated that a new claim for refund would likely come to him, and he would likely disallow the new claim for refund because the value of the Estate remained in dispute. Thus, this effort would only leave the Estate several months closer to the expiration of the period for bringing suit on its original claims for refund.

## ARGUMENT

### A. The Court Has Authority To Determine Its Own Jurisdiction.

This Court has the authority, and even the duty, to examine the evidence relevant to the jurisdictional facts in dispute and make findings relevant to its jurisdiction:

> [I]t is important to note that when the court is faced with a jurisdictional question, the court may consider all the relevant evidence to aid in the resolution of any disputes as to the truth of the jurisdictional facts alleged in the complaint. Also, "[t]he court is required to decide any facts which are relevant to the issue of jurisdiction."

*Thomas v. United States*, 56 Fed. Cl. 112, 118 fn. 3 (2003) (quoting *Calhoun v. United States,* 32 Fed. Cl. 400, 403 (1994), in turn, citing *Reynolds v. Army and Air Force Exchange Service,* 846 F.2d 746, 747 (Fed. Cir. 1988). Full payment of the principal amount of a tax deficiency, but not the interest, is required in order for the Court of Federal Claims to have jurisdiction over a claim for refund. *See Shore v. United States*, 9 F.3d 1524, 1527 (Fed. Cir. 1993). Whether the principal amount of the tax has been paid is a jurisdictional question of fact. *Id.* Inherent in the Court's power to make jurisdictional findings of fact is the authority to determine whether the Service properly accounted for payments and non-discretionary credits when determining whether a taxpayer has fully paid its tax liability prior to bringing suit.

The Transcript in this case, containing numerous irregularities and errors, does not provide sufficient evidence to resolve the questions of jurisdictional fact. The Form 4340

Certificate of Assessments and Payments is only "generally regarded as being sufficient proof, in the absence of evidence to the contrary, of the adequacy and propriety of notices and assessments that have been made." *Estate of Young v. United States*, 62 Fed. Cl. 589, 600-01 (2004) (quoting *Gentry v. United States,* 962 F.2d 555, 557 (6th Cir. 1992)) (emphasis added). Here, as the Estate has repeatedly shown over the last three months, there is overwhelming evidence to the contrary where the Transcript fails to take into account mandatory credits due to the Estate for state death taxes actually paid, contains patent irregularities, and is inconsistent with allegations of fact contained in the government's own motion to dismiss.

B. The Transcript Improperly Fails To Take Into Account The Mandatory State Death Tax Credit.

1. The state death tax credit is mandatory.

Providing credit for estate taxes paid to a state, to be applied dollar-for-dollar against federal estate taxes, is mandatory, not discretionary. *See* IRC § 2011(a). Nearly 50 years ago, this principle was recognized by the Tax Court and acquiesced to by the Service, even where an estate might later recover a refund of estate taxes paid to the state. *Estate of Weisberger*, 29 T.C. 217 (1957), *acq.* 1958-2 C.B. 3; *Estate of Phillips*, 36 B.T.A. 1102 (1937), *acq.* 1958-2 C.B. 3. As recently as 2001, the IRS again recognized this principle in advice issued by the Office of Chief Counsel. *See* Chief Counsel Advice 200108040 (issued February 23, 2001) (applying *Weisberger*); Field Service Advisory 200051044 (issued December 22, 2000) (stating that, even if state death taxes were refundable, the IRS would be protected under IRC § 2016). But here, the Service arbitrarily and without authority has taken the opposite position.

Historically, death taxes were the province of the States. When Congress enacted the modern federal estate tax in 1916, only six states did not already impose a state death tax. *See* Jeffrey A. Cooper, *Interstate Competition and State Death Taxes: A Modern Crisis in Historical*

*Perspective,* 33 Pepp. L. Rev. 835, 837 & 847 (2006). In order to prevent individual states from attracting wealthy residents by lowering their state death taxes, the states collectively lobbied Congress to pass the state death tax credit in order to provide "a strong incentive for all of the states to promote uniformity by adjusting their rates so as to realize neither more nor less than the amount credited on the tax payable to the Federal Government." *Id.* at 856. This would eliminate the benefit from moving to state death tax havens.

Congress also imposed a maximum state death tax credit allowed against federal estate taxes. This maximum credit was computed under IRC § 2011(b), and its predecessors, and increased as the value of the adjusted taxable estate increased. *See* IRC § 2011(b). Like many states, Georgia computed the amount of its state death taxes to take advantage of the maximum state death tax credit allowed under federal law by imposing a state tax equal to that maximum allowable credit. GA. Code § 48-12-2 (LexisNexis). Thus, the Georgia estate tax, and others like it, were colloquially referred to as "sponge" taxes, "pick-up" taxes or "sop" taxes because those states' taxes literally "sponged" up the maximum dollar-for-dollar credit allowed against federal estate taxes.

Because an increase in the Georgia estate taxes necessarily results from an increase in the value of the federal taxable estate, the Service's increase to the taxable estate of the plaintiff *ipso facto* increased the state death tax credit once those state death taxes were paid:

> The tax imposed by section 2001 [the estate tax] <u>shall</u> be credited with the amount of any estate, inheritance, legacy, or succession taxes actually paid to any State . . . .

I.R.C. § 2011(a) (explanation and emphasis added). Because this credit is mandatory, Congress provided a method for the Service to recover the state death tax credit in the event that any of the

state taxes paid by an estate were later refunded. *See* IRC § 2016 (prior to the Job Creation and Worker Assistance Act of 2002, P.L. 107-147 § 411(h)).[4]

a. For nearly 50 years the Service has acquiesced to the principal that the state death tax credit is mandatory.

The Courts long ago rejected the Service's argument that the state death tax credit is discretionary, holding that the state death tax credit *shall* be given to an estate upon payment of the state death taxes, and the Service acquiesced to this position nearly 50 years ago. *Estate of Weisberger*, 29 T.C. 217 (1957), *acq*. 1958-2 C.B. 3; *see* Chief Counsel Advice 200108040 (issued February 23, 2001) (applying *Weisberger*); Field Service Advisory 200051044 (issued on December 22, 2000). In the *Estate of Phillips*, 36 B.T.A. 1102 (1937), *acq*. 1958-2 C.B. 3, the Board of Tax Appeals (the predecessor to the Tax Court) reached a nearly identical holding under the corresponding provisions of the Revenue Act of 1926, stating that, even if a refund were received, the predecessor of IRC § 2016 would make the government whole. *Id.* at 1106. The Service should not litigate against a published acquiescence without first revoking that acquiescence. *See Rauenhorst v. Comm'r,* 119 T.C. 157, 171 (2002) (Service should not litigate position contrary to acquiescence contained in a published Revenue Ruling).

In *Weisberger*, the Tax Court soundly rejected the Service's argument that the state death tax credit was discretionary where the estate paid a portion of Ohio estate tax under a "temporary order," such that the estate might receive a refund of those state death taxes paid:

> [The Service's] argument, based upon the possibility of a refund in the future, is unsound. A refund of any tax paid is always possible, at least until barred by an applicable period of limitation. A tax paid may have to be refunded in whole or in part for any one of an infinite variety of reasons. To deny the credit claimed

[4] Effective for estates of decedents dying after December 31, 2004, the state death tax credit of IRC § 2011 was eliminated, *see* IRC § 2011(f), and IRC § 2016 was amended so as to apply only to the recovery of death taxes paid to foreign countries. *See* Job Creation and Worker Assistance Act of 2002, P.L. 107-147 §§ 411(h), 532(a).

> here simply because a future refund is possible is to judicially repeal section 813(b) [currently IRC § 2011(a)] . . . . Furthermore, Congress has recognized the possibility of such refunds and has made express provision therefor. Sec. 874(b)(3), I.R.C. 1939 [currently IRC § 2016].

*Weisberger,* 29 T.C. at 224 (explanation added). Thus, the Tax Court recognized that Congress provided a mechanism for the Service to recover any refund of state death tax in the predecessor to IRC § 2016, and found that this fit squarely within the statutory command to credit state death taxes paid dollar-for-dollar against the estate's federal estate tax liability, which is currently codified at IRC § 2011(a).

The mandatory nature of the state death tax credit is emphasized by the juxtaposition of the Tax Court's analysis of the mandatory credit next to a merely discretionary deduction. In *Weisberger,* the other issue was whether certain trust income was sufficiently exclusive to the decedent's wife for the trust to qualify for the marital deduction from the taxable estate. *Weisberger*, 29 T.C. at 223. In stark contrast to its analysis of the state death tax credit, the Tax Court recognized in the context of the marital deduction that the estate must shoulder a significant burden to show that it is entitled to the deduction. *See id.* at 220. The dollar-for-dollar credit of IRC § 2011 for estate taxes paid to the states, however, is essentially a payment that the Service must credit to an estate once the state death taxes are "actually paid." *See* IRC § 2011(a). Thus, the mere possibility of a refund of state death taxes is not enough to overcome the statutory command to credit state death taxes actually paid against an estate's federal tax liability. *See Estate of Phillips*, 36 B.T.A. at 1106.

b. The Service's argument that it cannot determine the maximum allowable state death tax credit, unless the Estate concedes the Service's valuation, is absurd.

The Service's position that the state death tax credit will be allowed only if the Estate gives up its right to dispute the Service's increased valuation is completely contrary to the

principles espoused in *Weisberger* and acquiesced to by the Service for nearly fifty years. According to the Service, it cannot determine the amount of the credit allowable unless the Estate first agrees not to challenge the Service's increased valuation. This argument is not only inconsistent with the Service's own statutory notice of deficiency but is wholly unsupported by the law. *See* Pl. Ex. E, p. E6 (Notice of Deficiency).

First, this argument is *ignoratio elenchi,* where the maximum allowable state death tax credit can be determined with mathematical certainty based on the Service's own position as to the value of the Estate. First, Section 2011(a) provides that the IRS shall credit the amount of state death taxes actually paid against the federal estate tax. Section 2011(b) then provides a maximum ceiling on the credit allowed against the federal estate tax through the use of a simple chart on which the left column lists the value of the adjusted taxable estate and a corresponding right column lists the amount of the credit allowed.[5] For example, the relevant portion of the chart in IRC § 2011(b) provides:

| If the adjusted taxable estate is: | The maximum tax credit shall be: |
|---|---|
| Over $10,040,000 . . . . . . | $1,082,800 plus 16% of the excess over $10,040,000 |

For purposes of this section, the term "adjusted taxable estate" means the taxable estate reduced by $60,000

IRC § 2011(b). This chart bears a striking resemblance to the appendix provided with the instructions to the IRS Form 1040, filed by millions of American taxpayers each year, in which the average American is expected to look to find the tax corresponding to their adjusted gross income. For the IRS to argue that this similarly ministerial calculation cannot be performed based on its own valuation of the Estate is beyond absurd.

[5] The current Internal Revenue Code contains IRC § 2011(b)(2) which phased out the state death tax credit until the credit was eliminated by IRC § 2011(f) for estates of decedent's dying after December 31, 2004.

Further, the Service's argument is contrary to the facts in *Weisberger*. The Tax Court in *Weisberger* also faced a dispute over the value of the estate subject to tax, but did not take that dispute into account to qualify in any manner its conclusion that the state death tax credit is mandatory. The first issue considered in *Weisberger* was whether the estate was entitled to a marital deduction under IRC § 812(e)(1)(F) (1939 Code). Thus, a dispute existed that could have affected the value of the net estate (the 1939 equivalent of the taxable estate) and therefore affected the ministerial calculation of the maximum allowable state death tax credit.[6] In fact, a few years later, the Estate of Weisberger brought another refund suit based on the marital deduction after a change in the law which provided for retroactive application. *See Estate of Weisberger v. United States,* 207 F. Supp. 609 (N.D. OH 1962), *aff'd,* 317 F.2d 519 (6th Cir. 1963). While the district court ultimately held in favor of the Service, the maximum allowable state death tax credit would have decreased if the refund suit had instead resulted in a decrease to the value of the net estate.

The subsequent refund suit in *Weisberger* is not unique, and it is absurd for the Service to now maintain that it will only credit state death taxes actually paid where it <u>believes</u> that the value of the estate will be uncontested.[7] The observation by the Tax Court in *Weisberger*, that "[a] refund of any tax paid is always possible, at least until barred by an applicable period of

---

[6] IRC § 813(b) of the 1939 Code provided that the maximum allowable state death tax credit could not exceed 80% of the estate tax imposed by IRC § 810. The estate tax in IRC § 810, in turn, was computed based on the net estate which, in turn, was computed by deducting the value of the marital deduction under IRC § 812(e)(1)(F). Thus, the dispute of the value of the marital deduction in *Weisberger* was a dispute impacting the value of the net estate, which, in turn, impacted the computation of the maximum allowable state death tax credit under IRC § 813(b).

[7] A taxpayer has three years from the time of paying a deficiency to file a claim for refund under IRC § 6511 and two years after the disallowance of a claim for refund to file suit under IRC § 6532(a). Therefore, the Service can only guess as to whether an estate will contest the Service's increase to the value of the estate when a claim for the state death tax credit is presented within four years after the filing of the estate's tax return.

limitation…," is equally applicable to refund suits for federal estate taxes. *See Weisberger,* 29 T.C. at 224.

2. Assuming *arguendo* that the Estate prevailed on the valuation issues in the case at bar, the Service could simply offset the decreased state death tax credit against the tax refund owed to the Estate.

Not only is the state death tax credit mandatory, it will only decrease if the Estate prevails on the valuation issue, in which case the Service can simply offset the decrease in the state death tax credit against the refund in tax otherwise owed to the Estate, as illustrated below:

| Taxable Estate + Adjusted Taxable Gifts | Fed. Estate Tax Before State Death Tax Credit | Max. State Death Tax Credit Allowable* | Fed. Estate Tax Minus State Death Tax Credit |
|---|---|---|---|
| $48,324,235 | $26,578,329 | $7,066,220 | $19,512,109 |
| 47,324,235 | 26,028,329 | 6,906,220 | 19,122,109 |
| 38,324,235 | 21,078,329 | 5,466,220 | 15,612,109 |

*Assumes, as Mr. Smith, the decedent made adjusted taxable gifts of $827,859 during his lifetime.

Thus, if the Estate prevails on its valuation, the Service would not even need IRC § 2016 to recover any decrease to the state death tax credit – the credit would simply be offset in the refund calculation.[8] On the other hand, if the government prevails on the valuation of the estate, no refund of state death taxes will be due and the state death tax credit will remain unchanged.

3. The Service's purported "90-Day Rule" is contrary to statutory authority and Revenue Rulings.

The Service recently took the position in this litigation that the state death tax credit cannot be allowed where substantiation was not submitted within 90 days of the issuance of the Notice of Deficiency, the period during which a taxpayer may petition the Tax Court and an assessment is prohibited under IRC § 6213(a). This position is contrary to the express statutory

[8] Analogously, IRC § 6402 authorizes the Service to first offset an overpayment by crediting it against another tax liability owed by the same taxpayer before issuing a refund.

provisions of IRC § 2011(c), which allow an estate to claim the credit within four years of the filing of its estate tax return, because the 91st day after the issuance of the Notice of Deficiency will always fall before the end of that four year period. *See* IRC § 6501(a) (deficiency must be assessed within 3 years of the filing of the estate tax return); IRC § 6501(c) (no extension of assessment period provided for estate taxes); IRC § 6213(a) (a deficiency may not be assessed until 90 days after the issuance of a statutory notice of deficiency); IRC § 6503(a) (period of limitations for assessment tolled during 90 days after issuance of Notice of Deficiency). For this reason alone, the Service's argument that the credit cannot be claimed after the 90 days fails.

In addition, the last day for the Service to assess a deficiency is 3 years and 150 days after the estate tax return is filed, which also ends before the 4 year period during which an estate may timely claim the state death tax credit end. *See* IRC §§ 6501(a), 6503(a). Consequently, claims for the state death tax credit will often be made after the assessment must be made. Congress could not have intended to provide for claiming the credit after an assessment must have been made, yet have denied the Service the authority to take that credit into account. In fact, contrary to the Service's position that the assessment is "set in stone," IRC § 6404(a) grants the Service authority to abate assessments that are excessive in amount.

Further, the Service's position that the state death tax credit may not be taken into account more than 90 days after the issuance of a notice of deficiency is contrary to the Service's own Revenue Rulings. Revenue Ruling 55-380 provides that "[a]ny communication relative to the allowance or submission of evidence in support of such credit received within four years after the filing of the estate tax return, if clearly indicating an intent to claim the credit, may be considered as a claim for credit within the statutory period . . . ." Rev. Rul. 55-380, 1955-1 C.B. 462. Thus, an estate may claim the credit either through a communication with the Service or by

submitting evidence to the Service. Further, "It is not necessary that the evidence in support of the credit claimed be filed within the statutory period [provided by IRC § 2011(c)] . . . ." Rev. Rul. 55-380 (explanation added). It is incomprehensible that, on the one hand, the Service would provide a time period for claiming and substantiating the credit that extends beyond the time it must assess a deficiency and, on the other hand, take the position that it has no authority to act on such a timely claim. For these reasons, the assessment of an estate tax deficiency does not prevent the Service from taking into account the state death tax credit.

4. The Estate claimed the state death tax credit within four years of filing its return and even within 90-days of the Notice of Deficiency, in multiple ways.

The Estate filed a claim for the state death tax credit on March 1, 2002, within four years of filing its estate tax return on January 26, 1999, and even within the inapplicable 90-day period after the mailing of the Notice of Deficiency on January 25, 2002. On March 1, 2002, the Estate hand delivered a payment of $19,290,867 to the Service in response to the Statutory Notice of Deficiency, along with a letter that claimed the state death tax credit in the amount of $7,066,220 (the sum of the $3,096,940 credit allowed with the Statutory Notice of Deficiency and the additional credit of $3,969,280 provided for by that Notice once proof of payment was provided), which letter is stamped as received by the Internal Revenue Service in Atlanta, Georgia on that same date. *See* Pl. Ex. F, pp. F1, F3 (Declaration of David M. Langford); Pl. Ex. E (Notice of Deficiency). This claim for the credit satisfies the standard of Rev. Rul. 55-380 of "[a]ny communication relative to the allowance...of such credit received within four years after the filing of the estate tax return, if clearly indicating an intent to claim the credit . . . ." Rev. Rul. 55-380, 1955-1 C.B. 462.

In addition, the Estate also satisfied the provision of Revenue Ruling 55-380 which provides that "[a]ny ...submission of evidence in support of such credit received within four

years after the filing of the estate tax return, if clearly indicating an intent to claim the credit, may be considered as a claim for credit within the statutory period…" Rev. Rul. 55-380, 1955-1 C.B. 462. In fact, two State of Georgia Estate Tax Certificates of Payment and three letters from the State of Georgia were submitted between July 28, 1998 and April 23, 2002 (within 90-days of the notice of deficiency) substantiating the payment of $5,964,186 in estate taxes to Georgia. *See* Pl. Ex. D, pp. D2-D9 (Declaration of Larry Childers, with attachments).

Further, the government's own motion to dismiss admits that the Estate's second claim for refund filed on September 13, 2002, within four years of the filing of the estate tax return, "sought an additional state death tax credit in the amount of $5,964,186 for state death taxes paid to the State of Georgia . . . ." but alleges that such claim was denied on March 23, 2005. *See* Govt. Motion, pp. 3-4. Thus, the government itself admits that the credit was timely claimed as part of the second claim for refund. However, the government's motion to dismiss offers no explanation for the denial of the credit where the Service received the last piece of substantiation from Georgia on April 23, 2002, three years before the denial.

C. The Transcript Should Be Disregarded And The Court Should Make Findings Based On An Examination Of The Underlying Facts.

1. The Transcript fails to take into account deductions for payments of interest that the Transcript itself admits were received.

The Service has also failed to take into account the deduction for annual interest payments made by the Estate pursuant to its IRC § 6166 election, even though the Service admits on its Transcript that the Estate paid this interest. Under Code section 6166, federal estate tax attributable to an interest in a "closely-held business" may be paid in installments if the value of the interest in the business exceeds a certain percentage of the decedent's estate. It is not in dispute that the Estate made this election, requiring the payment of annual interest installments. This interest expense is deductible for estate tax purposes. *See* Rev. Proc. 81-27, 1981-2 C.B.

547. Here again, the Service has an obligation to allow deductions for payments of interest that it admittedly received.

2. <u>The Transcript contains patent irregularities.</u>

In this case, the errors in the Transcript are glaring. In order to understand the import of the irregularities in the Transcript, it is helpful to understand the manner in which a Transcript is generated. The Claims Court summarized testimony by a representative of the Service in *Fulgoni v. United States*, 23 Cl.Ct. 119 (1991) that provides a helpful explanation:

> The tax examiner explained that a Transcript of Account and a Certificate of Assessments and Payments are prepared from the taxpayer's Master File. A Master File is stored electronically in the IRS computer system, and contains all of the information that the IRS keeps on a given taxpayer. The tax examiner explained that a Transcript of Account is an excerpt of a taxpayer's Master File, generally prepared for internal IRS use. A Certificate of Assessments and Payments [Form 4340], on the other hand, is an <u>abstract of certain information in the Master File</u> prepared either for purposes of litigation or upon the request of a taxpayer inquiring about the status of his account.

*Id.* at 125 (explanation and emphasis added). The Master File contains a computer account maintained by the Service for each taxpayer, which reflects information in the chronological order in which it was entered into the Master File. This information is then captured in an abstract known as the Transcript.

In *Estate of Young v. United States*, 62 Fed. Cl. 589 (2004), where the Transcript contained far fewer irregularities, this Court examined the underlying facts to assess the validity of the Transcript. *Id.* at 607. While the Court ultimately relied on the government's evidence to support the assessment, it did so only after receiving evidence and looking beyond the Transcript to examine the underlying facts bearing on whether the assessment was properly made. *Id.* There are even greater irregularities in the Transcript here, and this Court should once again examine the underlying facts to assess the accuracy of the Transcript. The glaring irregularities in the Transcript are described in more detail below.

a. The dates on which assessments were entered into the master file are inconsistent with the dates on which the assessments were allegedly made, requiring an examination of the underlying Form 23C to determine if the assessment of additional tax was properly made.

The Transcript contains patent irregularities that call into question whether the assessment of additional tax of $13,644,400, allegedly made on June 20, 2002, was properly made, or, if it was made, whether the assessment was timely made before the statute of limitations on assessment expired on June 25, 2002. The assessments should appear in the sequence in which they were entered into the computer Master File. Here, the assessment of additional tax of $13,644,400, allegedly made on June 20, 2002, does not appear on the Transcript until more than a month later and after an assessment allegedly made on July 22, 2002.

The Transcript correctly records the fact that the Service issued a refund check to the Estate of $9,543,372.21 on July 1, 2002. *See* Pl. Ex. F, p. F1, ¶ 3 (Declaration of David M. Langford). This means that the debit on the Estate's account resulting from the assessment of additional tax in the amount of $13,644,400 allegedly made on June 20, 2002, had not yet been entered into the Master File on July 1, 2002. If such assessment had been entered prior to July 1, 2002, this debit would have offset the credit from the Estate's tax payment of $19,290,867 on March 1, 2002, and the refund check would never have issued. Because of these irregularities, which call into question the accuracy of the Transcript, the Court should look to the source documents as it did in *Young* to determine when the assessment was in fact made. *Young,* 62 Fed. Cl. at 607.

b. The Transcript contains an erroneous filing date for the Estate's tax return, and, consequently, contains an erroneous assessment statute expiration date.

The Estate's Transcript also contains two key inaccuracies relevant to the last day on which the IRS could timely assess additional tax. First, the Transcript records February 1, 2002, as the date of the filing of the return when the Estate's return was actually filed on January 26, 1999, as admitted by the government in its motion to dismiss. Second, the Transcript states that the assessment expiration date was extended to July 1, 2002 when it was extended only to June 25, 2002.[9] This is of paramount importance, because as discussed above, it appears that the assessment of $13,644,400, if made at all, was not made until well after June 25, 2002.

To arrive at an assessment statute expiration date of June 25, 2002 date, three years are first added to the date the return was mailed, reaching January 26, 2002. IRC § 6501(a) (3 year limitations period). In accordance with IRC § 6503(a), 150 days is then added for the 90 days that the statute of limitations was suspended while the IRS was prohibited under IRC § 6213(a) from making an assessment following the issuance of a notice of deficiency, and for 60 days thereafter. This brings the last day for the IRS to timely assess to June 25, 2002.

c. Where the validity of the assessment is in question, the Service must be required to produce the Summary Record of Assessment (Form 23C).

In the face of the inaccuracies in the Transcript, the Service may not rest on the Transcript alone for proof of its assessment. Where the validity of the assessment is in question, the Service must be required to produce the Form 23C itself. *See Young*, 62 Fed. Cl. at 607 (court looked to underlying documents where validity of assessment was in question). Here, the Transcript is inaccurate on its face with regard to key dates relevant to the assessment of

[9] The Transcript's record of the extension of the statute of limitations on assessment is suspicious in any event because it was not entered into the Master File until May 19, 2003. *See* Def. Ex. 1 (Transcript).

additional tax and only the Form 23C can establish that the assessment was actually made within the statutory period. *See* I.R.C. § 6203; Treas. Reg. § 301.6203-1 (The date of the assessment is the date that an assessment officer signs the summary record of assessment).

These irregularities demand the production of the source documents to determine when the relevant assessment of additional tax in the amount of $13,644,400 was actually made, if it was made at all. Most importantly, the government must produce the summary record of assessment, the Form 23C. Congress provided that "Upon request of the taxpayer, the Secretary shall furnish a copy of the record of assessment." IRC § 6203. The Treasury Regulations provide that a taxpayer requesting a copy of the record of assessment will be provided with "the pertinent parts of the assessment which set forth the name of the taxpayer, the date of assessment, the character of the liability assessed, the taxable period, if applicable, and the amounts assessed." Treas. Reg. § 301.6203-1.

d. The Transcript improperly fails to take into account the Estate's payments.

The government's motion to dismiss alleges that the entire balance of $4,276,648.81 shown on the Transcript is principal tax but the Transcript simply provides a balance of assessed tax and interest, which fails to allocate the portion of the balance that corresponds to tax and the portion that corresponds to interest. Because only payment of the principal portion of the tax is required for jurisdiction, the allocation of the Estate's payments between principal and interest is of critical importance. *See Shore v. United States*, 9 F.3d 1524, 1527 (Fed. Cir. 1993). Further, the government's allegation that the entire balance on the Transcript is principal tax is inconsistent with the order in which the Service alleges that the payments (credits) and assessments (debits) were entered into the Estate's Master File account. The Transcript shows that the last assessment of interest in the amount of $388,153.22 was made on July 1, 2002,

which is after the assessment of additional tax in the amount of $13,644,400 was allegedly made on June 20, 2002 (even though the interest assessment appears on the Transcript prior to the additional tax assessment).

Even assuming *arguendo* that the assessments were made on the dates reported by the Transcript, the Estate's payment of $19,290,867 on March 1, 2002 should have been applied first to the June 20 assessment of $13,644,400 in tax and then to the July 1, 2002 assessment of "restricted interest" in the amount of $388,153.22. *See also* Rev. Proc. 84-58, 1984-2 CB 501 (a voluntary payment to the IRS in complete or partial satisfaction of a notice of deficiency without direction as to the application of the payment, is applied first to tax, then to penalty, then to interest).

Consequently, under the chronology of the assessments reported on the Transcript, the principal balance must be reduced by an amount equal to the $388,153.22 in "restricted interest" that the Transcript reports was assessed on July 1, 2002. The government's allocation of the Estate's payment between principal and interest would only logically result if the additional tax had been assessed after the July 1, 2002 assessment of interest. This would make the tax assessment untimely in any event, and any payment applied to the untimely assessment would constitute an "overpayment" by the Estate, as defined by the Internal Revenue Code. *See* IRC § 6401(a) ("term 'overpayment' includes that part of the amount of the payment of any internal revenue tax which is assessed or collected after the expiration of the period of limitation properly applicable thereto").

D. Based On The Evidence, The Court Should Make A Jurisdictional Finding That The Estate Has Fully Paid Its Estate Tax Liability.

Here, the government has produced a Transcript containing numerous irregularities, yet seeks to rely on it as proof that the $4,276,648.61 it shows as the outstanding balance is a

shortfall in the payment of tax, with no portion representing interest. For a court to simply rely on the Service's assertion that the tax has not been fully paid, where the Transcript is arbitrary and invalid on its face, would be tantamount to an abdication to the Service of the Court's inherent authority to determine its own jurisdiction. This Court may, in the course of making jurisdictional findings of fact, find that the Estate has fully paid its tax liability by properly taking into account the mandatory credit for state death taxes paid that resulted solely from the Service's own increase to the value of the taxable estate and the deduction of interest payments which the Service admittedly received.

As shown in the evidence submitted by the Estate, the Estate had fully paid its tax liability prior to filing this refund suit, but the Service failed to properly account for the Estate's payments and mandatory credits. This is reflected in the computations prepared for the Estate by Laura Peebles, CPA/PFS, the author of the BNA Portfolio *Estate Tax Credits and Computations,* #844-2nd. *See* Pl. Ex. A (Declaration of Laura H. Peebles). In addition, the computations prepared by the Department of Justice's own computations specialist show that the Estate fully paid its tax liability when the state death tax credit and the deductions for payments of interest under IRC § 6166 are properly taken into account. The Department's computations also show that, even if only the state death tax is credited, the amount which the Estate would be required to pay upon a voluntary dismissal would be only $533,455.81, not $4,276,648.61.

E. Alternatively, The Court Has The Authority To Issue A Writ Of Mandamus In Aid Of Its Prospective Jurisdiction, Directing The IRS To Correct The Transcript With The State Death Tax Credit.

The Court has authority under the All Writs Act to issue a writ of mandamus to correct the Transcript in order to protect its prospective refund suit jurisdiction granted by IRC § 7422 and 28 U.S.C. § 1491. *See* 28 U.S.C. § 1651(a) (All Writs Act); *Margolis v. Banner*, 599 F.2d

435, 440-41 (C.C.P.A. 1979) [10] (All Writs Act grants authority to issue mandamus correcting action of the Commissioner of Patents & Trademarks in order to protect prospective jurisdiction); *In re Makari*, 708 F.2d 709, 711 (Fed. Cir. 1983) (citing *Margolis,* court has authority to issue a writ to rectify an action that would otherwise frustrate prospective jurisdiction); *Branning v. United States*, 11 Cl.Ct. 136 (1986) (All Writs Act grants Court of Claims mandamus authority). While the All Writs Act is not itself a grant of jurisdiction, the Court may exercise authority under the Act to prevent abuses threatening the Court's prospective refund suit jurisdiction under IRC § 7422. *See Margolis,* 599 F.2d at 440-41 (mandated correction of Patent Commissioner's finding that patent claim was abandoned, instead of denied, where it would ultimately have jurisdiction to review denial).

1. The All Writs Act provides the Court with authority to issue writs in aid of its prospective jurisdiction.

The All Writs Act provides the Court of Federal Claims with the authority to issue extraordinary writs in aid of its jurisdiction:

> The Supreme Court and all courts established by Act of Congress may issue all writs necessary or appropriate in aid of their respective jurisdictions and agreeable to the usages and principles of law.

28 U.S.C. § 1651(a). The Court of Federal Claims' predecessor, the Claims Court, held that it "is, of course, a court established by Act of Congress; and, accordingly, this court is authorized to issue such writs as may be necessary or appropriate in aid of its jurisdiction," and this holding is no less true for the Court of Federal Claims. *See Branning*, 11 Cl.Ct. at 138-39.

The fact that the Court of Federal Claims is an Article I court does not diminish its authority to issue a writ of mandamus under the All Writs Act:

[10] The United States Court of Customs and Patent Appeals was subsumed into the jurisdiction of the Federal Circuit in 1982.

> Although this court, which was established by Congress under Article I of the Constitution, does not have general equity powers, the court has no doubt regarding its power to issue an injunction if and when the court should deem it necessary or advisable to do so in order to protect the jurisdiction of the court.

*Branning*, 11 Cl.Ct. at 138 (emphasis added); see also *Pueblo Laguna v. United States*, 60 Fed. Cl. 133, 136 (2004) (where court issued mandamus to prevent spoilation of evidence, stating "this court too must possess inherent powers, at least sufficient to protect the integrity of its judicial functions…"); *In re Bailey*, 182 F.3d 860, 864 n.4 (Fed. Cir. 1999) (Article I courts possesses inherent powers based on the need to protect the exercise of judicial authority).

The power to issue a writ in aid of jurisdiction is not limited to those cases in which the Court has already acquired jurisdiction; it extends to those cases over which the Court may have prospective jurisdiction. *Margolis v. Banner*, 599 F.2d 435, 440-41 (C.C.P.A. 1979); *In re Makari*, 708 F.2d 709, 711 (Fed. Cir. 1983); *Roche v. Evaporated Milk Ass'n*, 319 U.S. 21 (authority of circuit court "is not confined to the issuance of writs in aid of a jurisdiction already acquired by appeal but extends to those cases which are within its appellate jurisdiction although no appeal has been perfected.").

In *Margolis*, the U.S. Court of Customs and Patent Appeals issued a writ of mandamus in aid of its prospective jurisdiction which vacated a ruling by the Deputy Assistant Commissioner of Patents and Trademarks that a patent application had been abandoned. *Margolis,* 599 F.2d at 444. The court concluded that the erroneous ruling of abandonment "clearly had the effect of frustrating this court's prospective appellate jurisdiction over an appeal from a decision of the Board of Appeals." *Id* at 443. The court recognized that the remedy of a writ is to be "issued only in extraordinary circumstances when no meaningful alternatives are available," but concluded that the erroneous ruling of abandonment satisfied this condition where it was

"persuaded that no other adequate means is available that would permit petitioners to obtain review by the Board of Appeals and to secure this court's eventual appellate jurisdiction." *Id.*

While writs of mandamus are often issued by appellate courts to lower courts, lower courts may also issue writs protecting their jurisdiction. *See, e.g., N.R.D.C. v. Jamison*, 815 F. Supp. 454, 464 fn. 50 (D. D.C. 1992) (where circuit court is not granted direct review of an agency action, district court may act under the All Writs Act); *c.f.*, *Telecommunications Research and Action Ctr. v. FCC*, 750 F.2d 70, 75 (D.C. Cir. 1984) (Circuit Court had jurisdiction under All Writs Act to issue writ regarding unreasonable agency delay where it had exclusive jurisdiction over review of FCC final orders).[11]

2. The circumstances here unquestionably support the issuance of a writ.

The Court should exercise its discretion to issue a writ of mandamus where, under the circumstances of this case, (a) there are no other adequate means to obtain the desired relief, (b) the right to the issuance of the writ is clear and undisputable and (c) the writ is appropriate under the circumstances. *Cheney v. United States Dist. Ct. for D.C.*, 542 U.S. 367, 380-81 (2004); *see also Margolis,* 599 F.2d at 443. (requiring the existence of extraordinary circumstances with no meaningful alternatives).

a. No other adequate means exist for the Estate to obtain relief.

The Estate has no other adequate means to obtain relief from the Service's unlawful and arbitrary position that it will not provide the Estate with the statutorily mandated credit for state death taxes actually paid unless the Estate agrees not to contest the Service's valuation. The

[11] The reason much of the case law on this point originates in appellate courts is that, in many instances, United States Courts of Appeals have original jurisdiction to review agency actions. *See, e.g., Telecommunications Research and Action Ctr. v. FCC*, 750 F.2d at 75 (D.C. Cir. 1984) ("statutory commitment of review of FCC action to the Court of Appeals, read in conjunction with the All Writs Act...affords this court jurisdiction over claims of unreasonable Commission delay.")

Service's position, which is wholly inconsistent with the law and even its own published guidance, essentially requires the Estate to overpay its tax liability in order to avail itself of a refund suit. Because this unlawful denial of the credit concerns the very integrity of the process of invoking this Court's jurisdiction in a refund suit, the writ should issue.

The Service has already taken the position that the potential avenues of administrative relief that could be made available to the Estate upon a voluntary dismissal will not be considered for this Estate.[12] First, even though the Service has authority to reconsider the claims for refund disallowed on March 23, 2005, it has already taken the position that such claims cannot be reconsidered. *See Beemis Bros. Bag Co. v. United States*, 289 U.S. 28 (1933); IRS SCA 199941039 (IRS interpreting *Beemis* to stand for the proposition that "[t]he Service's disallowance of a claim will not constitute the final action by the Service if the Service did not fully consider all grounds for the refund"). The government's allegation in its motion to dismiss that it already fully considered the Estate's claims for refund, including the claims for the state death tax credit, is incredulous. S*ee* Govt. Motion, p. 4. The Service's disallowance of the Estate's claim for refund *ipso facto* resulted in a greater state death tax credit for those state death taxes paid as a result of the increase to the value of the Estate by the Service; thus, the Service could not have considered the credit unless its rejection is erroneous on its face.

The Service has also foreclosed the option of crediting the state death taxes paid through a pending claim for the state death tax credit or a new claim for refund. The March 1, 2002, claim for the credit had not been acted on by the IRS as of the time the above-captioned refund

[12] In its status report filed yesterday afternoon, government counsel indicates that it continues to pursue a possible administrative avenue that would allow the Service to reconsider the state death tax credit and the 6166 deductions. However, given the conduct of this case and the Service's arbitrary positions, the possibility of relief presented by the Service at the eleventh hour, while a motion to dismiss is pending, does not constitute the existence of adequate means for the Estate to obtain relief.

suit was filed and remains outstanding. But, the Service has taken the position that it would not allow this option. The Service has also taken the position that, if the Estate paid the $4,276,648.61 that the Service alleges is owed and filed a new claim for refund, the claim would almost certainly be denied unless the Estate agreed to forego its right to dispute the Service's increased valuation of the Estate and, thus, forego its right to this very refund suit. This position makes it crystal clear that this dispute does not center on the Estate's substantiation of its payments of Estate taxes to Georgia, which the Service admits is sufficient. *See* transcript of Court's hearing on July 6, 2006, p. 35, lines 16-17. Instead, the fulcrum point of the dispute is the Estate's access to the refund suit itself.

Furthermore, the government's argument in its motion to dismiss that this matter could have been disputed in the Tax Court, where pre-payment is not required, is wrong. The Service's denial of this mandatory state death tax credit arose after the Estate no longer had recourse to the Tax Court, and would similarly arise for other estates after the time to petition the Tax Court has passed. As explained above, Congress provided 4 years after the filing of the estate tax return for an estate to claim the state death tax credit. *See* IRC § 2011(c). The time to petition Tax Court will pass, at the latest, 3 years and 90 days after the filing of the estate tax return, and an estate will have no access to Tax Court to dispute a denial of the state death tax credit after that time. *See* IRC § 2011(c); IRC § 6501(a) (deficiency must be assessed within 3 years); IRC § 6213(a) (deficiency may not be assessed during 90 day period after the issuance of a Notice of Deficiency).

Moreover, because the state death tax credit is mandatory and "shall" be given for state death taxes "actually paid," the lapse of a Tax Court safety valve prior to the expiration of the time to claim the credit should be inconsequential in the statutory scheme. However, the Service

has now taken the arbitrary position that it will not allow the credit unless the Estate agrees to give up its right to dispute the Service's increased valuation in a refund suit. This position in essence requires an estate to pay the amount of the state death tax twice in order to access the refund suit: once to the state and again to the federal government. The Service cannot be allowed to deny a mandatory credit, which is essentially a payment against the federal estate tax liability, in a manner that unlawfully raises the hurdle for accessing a refund suit and that effectively eliminates a taxpayer's statutorily provided choice to pursue its claims in Tax Court, or, alternatively, in federal district court or this Court.

Further, the Service is taking internally inconsistent positions. Here, the government cannot provide a logical rationale for crediting state death taxes initially paid by the Estate in the amount of $3,096,940 while refusing to credit the balance of $2,867,246 paid as a result of the Service's increasing the value of the Estate. This refusal is arbitrary on its face. Where an assessment rises to this level of arbitrariness, it certainly cannot be accorded presumptive validity. *Estate of Young*, 62 Fed. Cl. at 600 ("when the decision of the IRS is shown to be without rational foundation or that it is arbitrary and erroneous, the assessment will not be accorded a rebuttable presumption of correctness.") (*citing Ruth v. United States*, 823 F.2d 1091, 1094 (7th Cir. 1987)). With regard to this credit, the assessment at issue is truly arbitrary.

b. <u>The Estate's right to the state death tax credit is clear and undisputable.</u>

As set forth in detail earlier in this brief, the Estate has a clear and undisputable right to the state death tax credit. The state death tax credit is mandatory. IRC § 2011(a). The Courts have struck down similar arguments by the Service that it would not allow a portion of the state death tax credit if the estate might ultimately be entitled to a refund of state death taxes, and the Service has acquiesced to those decisions. *Estate of Weisberger*, 29 T.C. 217 (1957), *acq.* 1958-

2 C.B. 3; *Estate of Phillips*, 36 B.T.A. 1102 (1937), *acq*. 1958-2 C.B. 3; Chief Counsel Advice 200108040 (issued February 23, 2001) (applying *Weisberger*); Field Service Advisory 200051044 (issued December 22, 2000). Further, the Service does not dispute that the credit was claimed in the Estate's claim for refund, which was submitted within four year period provided by IRC § 2011(c). *See* Govt. Motion, p. 4. Further, the Service admits that the substantiation submitted shows that the Georgia estate taxes were "actually paid." *See* transcript of Court's hearing on July 6, 2006, p. 35, lines 16-17. In addition, the Estate also timely claimed the credit in a separate letter hand delivered to the Service on March 1, 2002. *See* Pl. Ex. F, p. F3

The Service's only ground for denying the credit is a wholly unsupportable position that it cannot calculate the maximum allowable credit while the value of the Estate is in dispute. As shown above, this argument is absurd. The amount of the maximum allowable state death tax credit can be calculated with mathematical certainty based on the Service's valuation of the Estate. The Service cannot anticipate whether its increased valuation will be disputed and, its position that the credit will only be allowed where an estate does not dispute an increased valuation is contrary to the Internal Revenue Code. Further, the Service will never be out of pocket, even for a moment, if the Court finds that the Estate is owed a refund of tax, causing a decrease to the maximum allowable credit, because the amount of the credit can always be fully offset against the amount of the refund.

c. A writ of mandamus directing the Service to credit the Transcript for state death tax paid is appropriate under the circumstances.

The very essence of the dispute presently before the Court is the integrity of the process in which a taxpayer takes the steps necessary to invoke the jurisdiction of this Court. The remedy of a refund suit, over which Congress has provided this Court with jurisdiction under IRC § 7422 and 28 U.S.C. § 1491, is meaningless if the Service is allowed to arbitrarily

foreclose this avenue. When the Court examines its jurisdiction, it acts as the gatekeeper to the judicial process. To preserve the integrity of the system, the Court cannot allow the Service to refuse a mandatory credit, which follows from an increased valuation by the Service itself, unless the taxpayer gives up its right to dispute that increase in a refund suit. This requires the taxpayer not only to pay its taxes in full, as required by *Flora v. United States*, 362 U.S. 145 (1960), but to significantly overpay its taxes in order to access the Congressionally provided remedy of the refund suit.

The denial of a mandatory credit, contrary to the Service's own published positions, is equivalent to refusing to properly credit a payment made by a taxpayer unless the taxpayer agrees to give up its right to contest the Service's substantive determinations in a refund suit. These are extraordinary circumstances which demand extraordinary relief. Without this relief, the Estate would be required to pay $4,276,648.61, when even the government's own computations reveal that the Estate would owe only $533,455.81 if the mandatory credit were properly taken into account. *See* Pl. Ex. B, p. B3, part 2; Pl. Ex. C. As set forth above, the government itself does not contest the substantiation provided by the Estate. *See* transcript of Court's hearing on July 6, 2006, p. 35, lines 16-17. This is the very same substantiation that was provided within 4 years of the Estate's filing of its return on January 26, 1999, and even within the 90-day period after the issuance of the notice of deficiency. Even had the Estate not previously provided all the substantiation that the payments were actually made, it could still timely do so upon the dismissal of this suit. *See* Rev. Rul. 55-380, 1955-1 C.B. 462. However, the Service has made its position abundantly clear that the normal channels for consideration of the state death tax credit are closed for this Estate.

3. A writ of mandamus to protect this Court's jurisdiction is not contrary to the Tax Anti-Injunction Act.

Here, a writ of mandamus would not be prohibited under IRC § 7421, also known as the Tax Anti-Injunction Act, because the Estate is not seeking to restrain the assessment or collection of tax and, in any event, the requested relief would qualify for a judicial exception to the Act carved out by the Supreme Court. Section 7421(a) provides in pertinent part:

> ...no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court by any person, whether or not such person is the person against whom such tax was assessed.

IRC § 7421(a). In the present case, the writ of mandamus would only compel the Service to grant the Estate the mandatory state death tax credit. The Estate is not seeking to restrain the assessment or collection of tax.

Assuming *arguendo* that the mandamus falls within the scope of relief addressed by the Tax Anti-Injunction Act, an exception to the Act exists where it is clear that under no circumstances would the government prevail and there is otherwise no adequate remedy available:

> Nevertheless, if it is clear that under no circumstances could the Government ultimately prevail, the central purpose of the Act is inapplicable and, under the *Nut Margarine* case, the attempted collection may be enjoined if equity jurisdiction otherwise exists. In such a situation the exaction is merely in "the guise of a tax."

*Enochs v. Williams Packing and Navigation Co.*, 370 U.S. 1 (1962). In *Williams Packing*, the Supreme Court was considering the equitable relief of an injunction and therefore set forth a second consideration of irreparable harm, but, as set forth above, the central thrust of the judicial exception to IRC § 7421 is that the Act is inapplicable where "under no circumstances could the Government ultimately prevail." *Id.* at 6-7. As set forth earlier in this brief, the government under no circumstances can prevail in its position that the Estate is not entitled to the mandatory

state death tax credit unless it agrees to the Service's increased valuation of the Estate. Accordingly, the circumstances here meet the judicial exception of *Williams Packing*.

As recognized by the Supreme Court in *Williams Packing,* once the judicial exception is found to apply, the Court must consider whether the Estate is entitled to the relief it seeks. In *Williams Packing,* the requested relief was an equitable injunction and, consequently, irreparable harm had to be shown. Here, where the question is the issuance of a writ of mandamus, extraordinary circumstances must exist with no meaningful alternatives. For the reasons set forth in this brief, this case clearly presents such extraordinary circumstances and the Service has made it abundantly clear that there are no available alternatives. A writ should issue where the Service's position is clearly arbitrary, contrary to judicial precedent, contrary to its own published authority and even internally inconsistent.

## CONCLUSION

For the foregoing reasons, the Court should make a finding of jurisdictional fact that the Estate fully paid its tax liability prior to filing this refund suit. Or, in the alternative, under the distinct circumstances of this case, the Court may issue a Writ of Mandamus under the All Writs Act in aid of its prospective jurisdiction, directing the Service to correct the Transcript to reflect the mandatory state death tax credit. Such a mandamus would result in a balance of only $533,455.81 in tax under the government's own computations.

Respectfully submitted,

s/ Judith Mather by s/Alex L. Bertoldo
Judith A. Mather (Attorney of Record)
Tel: (202) 776-2714
Fax: (202) 776-4714
Email: jmather@dowlohnes.com
DOW LOHNES PLLC
1200 New Hampshire Ave., N.W., Ste. 800
Washington, D.C. 20036

Alex. L. Bertoldo (Of Counsel)
Tel: (202) 776-2045
Fax: (202) 776-4045
Email: abertoldo@dowlohnes.com
DOW LOHNES PLLC
1200 New Hampshire Ave., N.W., Ste. 800
Washington, D.C. 20036

ATTORNEYS FOR PLAINTIFF

CERTIFICATE OF SERVICE

I hereby certify that I have caused a copy of the foregoing *Memorandum in Opposition to Defendant's Motion to Dismiss* to be filed with the ECF System of the United States Court of Federal Claims this 2nd day of August 2006, with Notice of Electronic Filing to be made on all case participants who are ECF filing users in compliance with the service requirements of RCFC 5 and the proof of service requirements of RCFC 5.1, as provided in United States Court of Federal Claims General Order No. 42A. I am not aware of any case participants who are not ECF filing users of this Court.

s/ Judith Mather by s/Alex L. Bertoldo
Judith A. Mather (Attorney of Record)
Tel: (202) 776-2714
Fax: (202) 776-4714
Email: jmather@dowlohnes.com
DOW LOHNES PLLC
1200 New Hampshire Ave., N.W., Ste. 800
Washington, D.C. 20036